2004 ND 82

**Sandra PETERSON, Plaintiff and Appellant**

**v.**

**·NORTH DAKOTA UNIVERSITY SYSTEM, and Bismarck State College, Defendants and Appellees.**

**No. 20030249.**

Supreme Court of North Dakota.

April 13, 2004.

Charles "Casey" L. Chapman, Chapman & Chapman, Bismarck, ND, for plaintiff and appellant.

Tag C. Anderson, Assistant Attorney General, Bismarck, ND, for defendants and appellees.

VANDE WALLE, Chief Justice.

[¶ 1] Sandra Peterson appealed from summary judgment dismissing with prejudice her complaint against the North Dakota University System ("NDUS") and Bismarck State College ("BSC"). We affirm.

I

[¶ 2] Peterson was a tenured faculty member in the commercial art department at BSC. Under North Dakota State Board of Higher Education Policy Manual

("policy manual") section 605.3(8), BSC notified Peterson in April 1999 of its intent to dismiss her for cause, alleging she violated a State Board of Higher Education ("Board") policy and federal law by disclosing confidential information about a student to a classroom full of students. BSC directed Peterson to apologize for the violation. Her apology was considered inappropriate, and BSC claimed this constituted a substantial and manifest neglect of her duties. Through her attorney, Peterson challenged the sufficiency of the notice to dismiss her. In May 1999, Peterson received an amended notice of BSC's intent to dismiss her containing the original allegations and several new ones. The new allegations included neglect of teaching responsibilities for ending a class one month early and failing to appropriately clean up "dark room and/or lab areas," demonstrated incompetence in teaching for continually displaying an inappropriate pattern of behavior while assisting students, and demonstrated incompetence in teaching for indications received from the BSC Commercial Art Advisory Committee that it would not sign the renewal form to continue the BSC Commercial Art Program because of concerns regarding Peterson's abilities as an instructor.

[¶ 3] In July 1999, BSC President Donna Thigpen dismissed Peterson for cause. Peterson requested reconsideration, under section 605.3(8) of the policy manual, of her dismissal by a BSC faculty committee, which concluded she should not be dismissed. President Thigpen disagreed with the committee's decision and affirmed the decision dismissing Peterson for cause. Peterson requested reconsideration, as specified by section 605.4 of the policy manual, of this decision by the BSC Standing Committee on Faculty Rights ("Standing Committee"), which conducted a trial-like hearing in February 2000 and concluded BSC did not establish clear and convincing evidence that there was adequate cause to dismiss Peterson. President Thigpen reviewed the evidence presented at the hearing, and in a March 2000 letter, affirmed her prior decision to dismiss Peterson.

[¶ 4] Peterson's final appeal was to the Board, which requested an administrative law judge ("ALJ") from the Office of Administrative Hearings to review the record and make recommended findings of fact and conclusions of law. The ALJ concluded BSC proved by clear and convincing evidence that there was adequate cause to dismiss Peterson and recommended affirming her dismissal. In January 2001, the Board adopted the ALJ's recommendations and affirmed Peterson's dismissal.

[¶ 5] In July 2001, Peterson filed suit against NDUS and BSC (collectively "the State") in district court. She alleged breach of her employment contract, wrongful discharge, and civil conspiracy. The State moved for summary judgment. The district court granted the motion, finding Peterson failed to raise any genuine and material issues of fact regarding whether the Board's decision to dismiss her was objectively reasonable and made in good faith, and any genuine or material issue of fact to support her breach of contract, wrongful discharge, and conspiracy claims.

II

[¶ 6] Whether the trial court properly granted summary judgment is a question of law which we review de novo on the entire record. *Iglehart v. Iglehart*, 2003 ND 154, ¶ 9, 670 N.W.2d 343.

[S]ummary judgment ... is a procedural device under N.D.R.Civ.P. 56 for prompt and expeditious disposition of a controversy without a trial if either party is entitled to judgment as a matter of

law, and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not alter the result. On appeal, we review the evidence in the light most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which reasonably can be drawn from the evidence. The party moving for summary judgment bears the burden of establishing there is no genuine issue of material fact and that, under applicable principles of substantive law, he is entitled to judgment as a matter of law.

*Green v. Mid Dakota Clinic*, 2004 ND 12, ¶ 5, 673 N.W.2d 257 (citations omitted).

[¶ 7] The State Board of Higher Education was created to control and administer several state educational institutions, known as the North Dakota University System. N.D. Const. art. VIII, § 6; N.D.C.C. § 15–10–01.3. Bismarck State College is part of the North Dakota University System. N.D.C.C. § 15–10–01. The Board has all the powers necessary to control and manage the institutions of the NDUS, including removing professors from employment. N.D.C.C. § 15–10–17. Regulations adopted by the Board as part of its policy manual govern termination of faculty members and "are part of the employment contract between the institution and faculty member." *Hom v. State*, 459 N.W.2d 823, 824 (N.D.1990).

[¶ 8] Peterson was a full-time tenured faculty member at BSC. "Tenured appointments recognize a right, subject to Board policy, to continuous academic year employment in an academic unit or program area as defined by an institution and stated on the contract." North Dakota State Board of Higher Education Policy Manual, Academic Freedom and Tenure; Academic Appointments, § 605.1(4)(b) (2001). "Tenure in the academic community commonly refers to a status granted, usually after a probationary period, which protects a teacher from dismissal except for serious misconduct, incompetence, financial exigency, or change in institutional programs. The primary function of tenure is the preservation of academic freedom." *Stensrud v. Mayville State College*, 368 N.W.2d 519, 521 n. 1 (N.D.1985) (citations omitted).

[¶ 9] At the time of Peterson's dismissal, section 605.3(8) (1996) of the policy manual allowed dismissal of a tenured faculty member for cause. It defined "Adequate Cause" as:

(a) demonstrated incompetence or dishonesty in teaching, research, or other professional activity related to institutional responsibilities, (b) continued or repeated unsatisfactory performance evaluations and failure to respond in a satisfactory manner to a recommended plan for improvement, (c) substantial and manifest neglect of duty, (d) conduct which substantially impairs the individual's fulfillment of his or her institutional responsibilities or the institutional responsibilities of others, (e) a physical or mental inability to perform assigned duties, provided that such action is consistent with laws prohibiting discrimination based upon disability, or (f) significant or continued violations of Board policy or institutional policy, provided that for violations of institutional policy the faculty member must have been notified in advance in writing by the institution's chief executive that violation would constitute grounds for dismissal, or the institutional policy must have provided specifically for dismissal as a sanction.

Section 605.4 of the policy manual allowed faculty members to appeal adverse decisions to the Standing Committee. In ap-

peals to the Standing Committee involving dismissals for cause, the institution was required to prove that grounds for its actions existed by clear and convincing evidence. North Dakota State Board of Higher Education Policy Manual, Hearings and Appeals, § 605.4(8) (1998). The Standing Committee was required to report its findings, conclusions, and recommendations to the institution's chief executive, who had to make a decision and notify the Standing Committee and the faculty member of the result. *Id.* § 605.4(11). At the time of Peterson's dismissal, the chief executive's decision was considered final except, in cases involving dismissals for cause, a faculty member could appeal the chief executive's decision to the Board. *Id.* § 605.4(12).[1]

[¶ 10] Peterson contends her employment contract was breached because BSC did not prove, by clear and convincing evidence, that there was adequate cause to dismiss her.

### A.

[¶ 11] As an initial matter, we must determine the appropriate standard of judicial review for substantive determinations by the Board. The State asks us to conclude that Peterson should be required to petition for a writ of mandamus seeking relief from the Board's decision. Alternatively, it contends the standard from *Thompson v. Associated Potato Growers, Inc.,* 2000 ND 95, 610 N.W.2d 53, should control judicial review of Peterson's claims. Peterson seeks a de novo determination whether her contract was breached, or she asserts that if *Thompson* is applicable, summary judgment was inappropriate because the Board contractually promised her greater rights than *Thompson* provides and a jury should decide whether the

Board's decision was objectively reasonable and made in good faith.

[¶ 12] We disagree with the State's assertion that a writ of mandamus is the proper avenue for Peterson to proceed with her claim. The State did not present this argument to the trial court and did not address it in its brief. Unlike decisions not to renew the contracts of elementary and secondary teachers, there is no statutory guidance regarding a decision by the Board to dismiss a faculty member of an institution in the NDUS. *See* N.D.C.C. ch. 15.1–15. Courts may issue a writ of mandamus "to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled and from which the party is precluded unlawfully by such inferior tribunal, corporation, board, or person." N.D.C.C. § 32–34–01. In a case involving the nonrenewal of a professor's employment contract with a private college, we held:

> The writ of mandamus is available to the [elementary or secondary education] teacher to compel the school district to comply with its statutory mandate to renew the teacher's contract.
>
> . . . .
>
> In light of ... the contractual and nonstatutory nature of [the professor's] employment relationship with the College she, as a matter of law, is not entitled to ... a writ of mandamus to compel reinstatement of her teaching position.

*Schauer v. Jamestown College,* 323 N.W.2d 114, 115–16 (N.D.1982). Similarly,

---

1. An appeal to the Board is not provided in the current policy manual. Section 605.4(12)

(2001) provides "[t]he decision of the president is final."

Peterson's claims are contractual and not statutory in nature. *See Stensrud*, 368 N.W.2d at 521 & n. 2 (stating the terms of the contract govern the manner in which a college professor may be terminated and the abuse of discretion standard used by the trial court was inappropriate because there were no statutory requirements governing a nontenured college professor's employment contract). Therefore, a writ of mandamus is not appropriate and the terms of Peterson's employment contract govern the manner in which she may be terminated.

[¶ 13] The Board is a constitutional body with full power and authority to appoint and remove professors of higher education institutions under its control. *Posin v. State Bd. of Higher Educ.*, 86 N.W.2d 31, 34–35 (N.D.1957); *see also* Richard B. Crockett, *Constitutional Autonomy and the North Dakota State Board of Higher Education*, 54 N.D. L.Rev. 529, 533–34 (1978). Because the Board exercises constitutional powers, our review of its substantive decisions is akin to the review we employ when the doctrine of separation of powers applies. Article XI, section 26, of the North Dakota Constitution formalizes the doctrine of separation of powers. *See State v. Hanson*, 558 N.W.2d 611, 611 n. 1 (N.D.1996). "[T]he doctrine of separation of powers restricts judicial review of decisions by the executive branch of government." *Med. Arts Clinic, P.C., v. Franciscan Initiatives, Inc.*, 531 N.W.2d 289, 300 (N.D.1995). The Board is excluded from the definition of an "administrative agency" by N.D.C.C. § 28–32–01(2)(j). Consequently, to secure review of a Board decision, a person adversely affected must bring a separate action in district court because there is no statute or rule providing an appeal to the district court similar to the appeal provided from administrative agency decisions. *See* N.D.C.C. § 28–32–42.

[¶ 14] Nonetheless, recognizing the separation of powers doctrine, we conclude judicial review similar to that provided in appeals from administrative agency decisions is appropriate in this case. In reviewing factual findings from administrative agencies we have held, "we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence." *See Power Fuels, Inc., v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979). Peterson was required to exhaust her administrative remedies before she could bring an action in district court. *See Long v. Samson*, 1997 ND 174, ¶ 10, 568 N.W.2d 602 (dismissed public employees must exhaust their administrative remedies before seeking damages for tort or contract claims). NDUS and BSC were required to follow the procedures provided in the policy manual in order to dismiss Peterson for cause. *See Stensrud*, 368 N.W.2d at 522 ("Generally, substantial compliance with the procedural requirements for termination is sufficient if their purpose is fulfilled"). Because a de novo review of Peterson's breach of contract claim would render the Board's administrative review procedures meaningless and would be contrary to the holding in *Posin*, we are persuaded that the proper standard for courts to review a substantive Board decision dismissing a tenured faculty member for cause is determining whether a reasoning mind could have reasonably determined that the factual conclusions were supported by, as the policy manual provides, clear and convincing evidence. *See Posin*, 86 N.W.2d at 35–36.

[¶ 15] This approach is consistent with our review in private breach of employ-

ment contract cases, which are governed by the standard set forth in *Thompson*. In *Thompson*, we reversed and remanded a trial court's judgment awarding Thompson damages for wrongful termination of his employment. 2000 ND 95, ¶ 1, 610 N.W.2d 53. Thompson was a contract employee who was terminated for cause from his employment at Associated. The trial court found Thompson did not commit a material violation of Associated's policies or a material breach of the provisions of the employment agreement. *Id.* at ¶ 5. On appeal, we explained that employment in North Dakota is presumed to be at will, but parties can modify the presumption and define their contractual rights regarding termination. *Id.* at ¶ 8.

[¶ 16] In evaluating whether there was a breach of the contract, we relied on *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal.4th 93, 69 Cal.Rptr.2d 900, 948 P.2d 412, 422 (1998), and

adopt[ed] the objective good-faith standard under which an employer is justified in terminating an employee for good cause for "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. *A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.*"

*Thompson*, 2000 ND 95, ¶ 20, 610 N.W.2d 53 (citations omitted) (emphasis added). We held the trial court erred by not applying an objective good-faith standard for deciding whether there was cause to terminate Thompson. *Id.* at ¶ 22.

[¶ 17] Job discipline and dismissal appeals to the Board must be conducted by the office of administrative hearings in accordance with applicable laws. N.D.C.C.

§ 54–57–03. At the time of Peterson's dismissal, a hearing officer conducted the appeal to the Board

pursuant to N.D.C.C. ch. 54–57, by reviewing the record and, based upon that review making recommended findings of fact, conclusions of law and a recommended order to the Board. The Board may, in its discretion, ask the hearing officer to conduct a limited hearing or conduct a de novo hearing, and then make recommended findings of fact, conclusions of law and a recommended order to the Board. Proceedings on appeal shall be governed by the Uniform Rules of Administrative Practice and Procedure of the Office of Administrative Hearings. There is no appeal to the Board from a final decision of the institution's chief executive except from decisions resulting in dismissal for cause.

North Dakota State Board of Higher Education Policy Manual, Hearings and Appeals, § 605.4(12) (1998). This review, along with compliance with the procedures in the policy manual, created a sufficient record of the proceedings before the Board for judicial review. *See Koch Hydrocarbon Co. v. State*, 454 N.W.2d 508, 513–15 (N.D.1990) (VandeWalle, J., concurring specially) (expressing concern over the lack of an adequate record to review a decision by the State Board of Equalization, which was excluded from the definition of an administrative agency).

If the courts are to review these actions, and it is not necessary as a matter of constitutional right that they be empowered to do so, it should be a meaningful review recognizing the limitations thereon by the doctrine of separation of powers. Anything less than a meaningful review gives a false sense of adherence to our system of checks and balances which makes the judicial branch little more than an apologist for the actions of

the executive branch of government, on the one hand, or a usurper of powers on the other. Neither is a desirable result. *Id.* at 515.

[¶ 18] In a breach of contract action where the Board has determined adequate cause exists to dismiss a contract employee, the courts can provide a meaningful review by adhering to our prior decisions that procedural violations occur if the State has not substantially complied with its established procedures and by reviewing substantive decisions to determine whether a reasoning mind could have reached the same conclusion on the evidence presented.

### B.

[¶ 19] The trial court granted the State's summary judgment motion because it concluded Peterson had not raised a genuine or material issue of fact regarding whether the Board's decision was objectively reasonable and made in good faith or any genuine or material issue of fact to support her breach of contract claim. The record reflects that the Board complied with the procedural requirements in the policy manual. Therefore, we must determine whether summary judgment was appropriate in terms of Peterson's substantive claim that her employment contract was breached because adequate cause to dismiss her was not established by clear and convincing evidence.

[¶ 20] In exhausting the administrative procedures provided in Peterson's contract, two committees and the Board reviewed President Thigpen's decision to dismiss Peterson for cause. The Standing Committee conducted a trial-like hearing in which it heard testimony from various witnesses and arguments from both sides. It found Peterson violated Board policy by disclosing confidential information about a student, but the BSC "administration did

not consider this violation to be cause for dismissal when the matter was initially addressed." It found the amended notice of intent to dismiss added "very little new cause" for Peterson's dismissal. It concluded that BSC ·

A. By it's [sic] own determination, did not cite the [student privacy] violation of Board policy to be cause for dismissal when it first occured [sic], and opted for an apology instead. It should have been over.

B. By it's [sic] own determination, did not cite the nature of the ... apology to be cause for dismissal either, and opted for a reprimand, with a plan for improvement. It should have been over again.

C. By it's [sic] own determination, terminated this matter as attested in President Thigpen's 03/31/99 letter to [the student], in which she wrote, "The college has taken appropriate action regarding Sandra Peterson." It should have been over again.

It determined BSC did not prove, by clear and convincing evidence, adequate cause to dismiss Peterson.

[¶ 21] After reviewing the evidence presented at the hearing and the Standing Committee's report, President Thigpen concluded that the administration did establish, by clear and convincing evidence, adequate cause to dismiss Peterson. She concluded the privacy violation and the subsequent, inappropriate apology constituted cause for dismissal. Additionally, she stated:

The Committee report does not mention that all three of Peterson's colleagues in her department testified that numerous students complained to them almost every year about Peterson. All three of these colleagues testified that they agree with the decision to terminate Pe-

terson because she has simply not been doing her job. Further, the report does not mention that former Dean Togstad met with Peterson in 1996 about student complaints and informed her that the administration would initiate proceedings to dismiss her if the problems continued. I considered very carefully the testimony of her three colleagues and her supervisors. Her colleagues worked with her on a daily basis, taught in the same discipline, and advised students, therefore, they are in the best position to evaluate her abilities.

. . . .

The Committee finds that there is "no precedence for dismissal after a first offense." Although I find nothing in the record that supports this statement, the dismissal is not based on a single offense.

The Committee finds that a poor apology and leaving class early are not substantial and manifest neglect. The Committee ignored (or misconstrued) Peterson's neglect in ending a class, without authorization, one month prior to the semester end.

The Committee dismisses the allegation about incompetence in teaching by stating that one complaint by two students does not address teaching competence. I find not just one complaint by two students but numerous complaints, most verbal but including three formal, written complaints, by students about Peterson over a period of many years.

. . . .

Considering the entire record as a whole, I conclude that the administration established, by clear and convincing evidence, cause to dismiss Sandra Peterson based upon a significant violation of State Board of Higher Education policy, substantial and manifest neglect of duty, and demonstrated incompetence in teaching.

As a result, President Thigpen affirmed Peterson's dismissal, effective March 31, 2000.

[¶ 22] On appeal to the Board, the ALJ reviewed the transcript of the Standing Committee hearing, the exhibits admitted, and the post-hearing briefs submitted by the parties. The Board allowed the ALJ to receive additional evidence if necessary, but neither party provided additional evidence. In reviewing President Thigpen's decision on appeal, the ALJ concluded:

1. Sandra Peterson's disclosure to other students that a fellow student had previously failed a class constituted a significant violation of SBHE Policy 1912. That policy provides that student education records are confidential according to the federal Family Education Rights and Privacy Act. A record of a student's prior enrollment in a particular class and grade or record of whether a student failed a class is confidential. Peterson's subsequent failure to take full responsibility for her conduct and criticism of the student in question in front of other students for filing a complaint about Peterson was unprofessional, inappropriate and did not conform to an agreement reached between the student and Peterson to resolve the student's complaint.

2. Peterson's conduct in leaving a class early after reading a statement to the class constituted substantial and manifest neglect of duty.

3. Peterson's conduct in ending a class one month before the semester end without authorization constituted substantial and manifest neglect of duty.

4. Peterson's persistent pattern of unprofessional and inappropriate behavior toward her students, including ignor-

ing or refusing to respond to questions and requests for assistance and inappropriate comments about students constituted demonstrated incompetence in teaching. Responding to student questions and requests for assistance and advising students is an important part of the job of teaching. Peterson had been warned and counseled about her treatment of students on several occasions and she was informed that if students continued to complain her employment would be terminated. In spite of these discussions and warnings, Peterson persisted in treating some of her students in an unacceptable manner.

5. Bismarck State College established, by clear and convincing evidence, adequate cause to dismiss Sandra Peterson for significant violation of state board of higher education policy, substantial and manifest neglect of duty, and demonstrated incompetence in teaching, in accordance with state board of higher education policies governing dismissal of a faculty member, SBHE Policies 605.3 and 605.4.

The Board adopted the ALJ's findings and conclusions and affirmed Peterson's dismissal for cause.

■ [¶ 23] Peterson contends BSC contractually bound itself to a more restrictive burden of proof in cases involving the dismissals of tenured faculty members for cause. She relies on *Thompson*, in which we noted "[t]he California Supreme Court recognized an employer may contract away its right to decide whether facts constituting cause for termination exist." 2000 ND 95, ¶ 17, 610 N.W.2d 53 (citing *Cotran*, 69 Cal.Rptr.2d 900, 948 P.2d at 419–20). The construction of a written contract to determine its legal effect is a question of law. *Id.* at ¶ 9, 69 Cal.Rptr.2d 900, 948 P.2d 412. The NDUS policies did not contract away the Board's right to

make the final determination whether adequate cause existed to dismiss Peterson. Section 605.4(11) (1998) of the policy manual provided, "In all cases except those resulting in a decision to dismiss a tenured faculty member in which the faculty member files an appeal with the Board . . ., the decision of the chief executive is final." This policy established the Board as the final arbitrator in appeals regarding dismissals of tenured faculty members for cause. The contract required BSC to show clear and convincing evidence that adequate cause existed to terminate Peterson. *See* North Dakota State Board of Higher Education Policy Manual, Hearings and Appeals, § 605.4 (1998). Therefore, Peterson contracted that the Board would be the final authority regarding whether there was adequate cause and we must determine whether, on the evidence presented to the Board, a reasoning mind could conclude there was clear and convincing evidence to dismiss her for cause.

■ [¶ 24] Viewing the facts and reasonable inferences in a light most favorable to Peterson, we conclude she has not raised a genuine or material issue of fact showing a reasoning mind could not have concluded there was adequate cause to dismiss her. Rather, the record reflects that different committees, boards, or persons placed different weight on the evidence presented. Peterson contracted for the procedures afforded to her. A breach of Peterson's employment contract does not occur merely because she disagrees with the substantive result of those procedures. The mere fact that different opinions could be reached based on the facts is not sufficient to establish the Board breached her employment contract. There was sufficient evidence in the record for a reasoning mind to conclude clear and convincing evidence existed to dismiss Peterson for cause. Accordingly, we affirm

the summary judgment dismissing Peterson's breach of contract claim.

## III

[¶ 25] The trial court concluded Peterson did not raise any genuine or material issue of fact to support her wrongful discharge and conspiracy claims. In actions where contract employees have been terminated for cause, breach of contract has been evaluated as the basis for wrongful termination. *See generally Thompson*, 2000 ND 95, 610 N.W.2d 53 (evaluating whether Associated wrongfully terminated Thompson under his employment contract). In at-will employment situations, this Court has recognized a public policy exception to the employer's right to terminate an employee. *See Jose v. Norwest Bank North Dakota, N.A.*, 1999 ND 175, ¶ 17, 599 N.W.2d 293 (reviewing cases in which the public policy exception has prohibited terminating an at-will employee). The public policy must be evidenced by a constitutional or statutory provision to prohibit terminating an at-will employee. *Id.* (citing *Ressler v. Humane Soc'y of Grand Forks*, 480 N.W.2d 429, 431 (N.D.1992) and *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793, 794 (N.D.1987)).

[¶ 26] Peterson claims the established policies of NDUS are examples of the public policy of the State of North Dakota that protect tenured college professors from arbitrary and capricious dismissal. She alleges BSC violated its policies because the administration engaged in a concerted effort to dismiss her after she signed a letter in early March 1999 that complained about the termination of her department chair. We have previously held that an action for retaliatory discharge in violation of public policy is a tort. *Ghorbanni v. North Dakota Council on Arts*, 2002 ND 22, ¶ 13, 639 N.W.2d 507 (citing *Krein*, 415 N.W.2d at 794–95).

However, Peterson's wrongful discharge claim depends entirely upon the provisions of her contract protecting her from arbitrary and capricious removal, and is therefore, a restatement of her breach of contract claim. Similar to her breach of contract claim, she has not presented a genuine or material issue of fact that would support her claim for wrongful discharge, and the trial court did not err in summarily dismissing it. *See Pioneer Fuels, Inc., v. Montana–Dakota Utilities Co.*, 474 N.W.2d 706, 710 (N.D.1991) ("A breach of contract even if intentional, malicious, or in bad faith, is not enough to convert a contract action into a tort action").

[¶ 27] A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damage[s]. The distinguishing factor between a criminal conspiracy and a civil conspiracy is that damages, not the agreement, are the essence of the conspiracy." *Hurt v. Freeland*, 1999 ND 12, ¶ 37, 589 N.W.2d 551 (internal citation and quotation marks omitted). Peterson has not produced any evidence indicating there was an agreement by BSC or its agents to commit an unlawful act or a lawful act by unlawful means. The only possible agreement in this case would be to breach Peterson's employment contract. However, a breach of contract alone is not a tort and it will not support a claim for civil conspiracy. *See Pioneer Fuels, Inc.*, 474 N.W.2d at 710; *see also Grizzle v. Texas Commerce Bank, N.A.*, 38 S.W.3d 265, 285 (Tex.App. 2001), *rev'd on other grounds in part by Texas Commerce Bank, N.A., v. Grizzle*,

96 S.W.3d 240 (Tex.2002) ("Because breach of contract is not a tort, it will not support a civil conspiracy"). Not only is a breach of contract alone not a tort, we have held the Board did not breach its contract with Peterson. Accordingly, the trial court did not err in granting summary judgment and dismissing Peterson's civil conspiracy claim.

[¶ 28]   The judgment is affirmed.

[¶ 29] DALE V. SANDSTROM, WILLIAM A. NEUMANN, MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.